**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

**AMEDISYS HOLDING, LLC,**

                              **Plaintiff,**

    **v.**                                        **1:11-cv-1437-WSD**


**INTERIM HEALTHCARE OF
ATLANTA, INC., DENISE
CATHEY, BRENDA HOGAN, and
JENNIFER MACK,**

                       **Defendants.**


## <u>OPINION AND ORDER</u>

This matter is before the Court on Amedisys Holding, LLC's Motion for a

Preliminary Injunction [25] and Motion for Leave to File Supplemental Exhibits in

Support of its Motion for Preliminary Injunction [35].  The Court, having

considered the memorandum submitted by the parties, as well as the arguments of

counsel and testimony presented at the May 23, 2011, hearing on Plaintiff's

injunction motion, now considers Plaintiff's request for preliminary injunctive

relief.

# I.    BACKGROUND

Plaintiff Amedisys Holding, LLC ("Amedisys") and Defendant Interim Healthcare of Atlanta, Inc. ("Interim") compete in providing home healthcare and hospice services.  They each employ sales representatives who meet with doctors and other healthcare practitioners to encourage those clinicians to refer patients in need of home healthcare and hospice services.  On April 18, 2011, three Amedisys sales representatives, Defendants Jennifer Mack ("Mack"), Brenda Hogan ("Hogan"), and Denise Cathey ("Cathey") (collectively the "Individual Defendants"), resigned from Amedisys to begin employment at Interim.  Amedisys alleges that the Individual Defendants took confidential and trade-secret materials before they left and have used those materials at Interim.

The trade-secret materials at issue in this case are known as the "Referral Logs" and the "Workbook."  The Referral Logs are a resource to track patient referrals.  They contain detailed information regarding current and prospective patients.  Amedisys employees use the Referral Logs to target their sales efforts to particular clinicians and facilities most likely to refer patients to Amedisys.[1]  This allows their employees to concentrate their marketing efforts on the clinicians most likely to generate business for Amedisys.  The Workbook is a short document that

---

[1] Amedisys employees compile the Referral Logs through their visits to doctors and healthcare centers.

contains doctor referral statistics and other industry metrics. It ranks doctors within a particular geographic area based on the number of home healthcare and hospice referrals each doctor issues.[2] Amedisys employees use the Workbook to target certain doctors who frequently refer patients for home healthcare and hospice services. Amedisys claims that it treats and maintains both the Referral Logs and the Workbook as trade secrets.

On April 12, 2011, six days before she left Amedisys, Defendant Mack sent a copy of the Referral Logs from her Amedisys email account to her personal email account. These particular Referral Logs contained information on over 1,200 patients from several geographic areas, including areas in which Mack did not work as an Amedisys employee. Amedisys further alleges that Mack provided the Referral Logs to Defendant Cathey. On April 18, 2011, the day she left Amedisys, Defendant Hogan failed to return a copy of the Workbook before beginning her employment with Interim.

In the days after the Individual Defendants left Amedisys, several Amedisys employees saw the Individual Defendants soliciting business at local hospitals and patient care centers. Amedisys contends that the Individual Defendants have and

---

[2] A third party prepares the Workbook and sends an updated copy to Amedisys every quarter. The third party charges Amedisys $12,500 for every quarterly update. (Benton Decl. ¶ 6.)

continue to use the Referral Logs and the Workbook to compete against Amedisys at their new employer Interim.

On May 4, 2011, Plaintiff filed the Complaint in this action, alleging that the Individual Defendants and Interim (collectively "Defendants") took Amedisys' trade secrets to unfairly compete in the provision of healthcare and hospice services.  The Complaint lists eight causes of action, including: (1) violation of the Stored Communications Act, 18 U.S.C. §§ 2701, 2707; (2) violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030; (3) misappropriation of trade secrets, O.C.G.A. § 10-1-760 et seq.; (4) Computer Theft and Computer Invasion of Privacy, O.C.G.A. § 16-9-93; (5) breach of fiduciary duty and employee duty of loyalty; (6) tortious interference with business relations; (7) trover/conversion of corporate property and assets; and (8) breach of contract.[3]  The Complaint also sought injunctive relief, specifically, an order prohibiting the Defendants from using Plaintiff's confidential, proprietary, and trade-secret information.

Plaintiff also sought a Temporary Restraining Order ("TRO") requiring (1) the Defendants to return any Amedisys trade secret materials they had in their possession or to which they had access; (2) the Defendants to submit to a forensic

---

[3] Counts 1, 2, 4, 7, and 8 are based on the conduct of Mack and Hogan, Count 5 is based on the conduct of each of the Individual Defendants, and Counts 3 and 6 are based on the conduct of the Individual Defendants and Interim.

audit of their computer systems; and (3) prohibiting the Individual Defendants from soliciting business on behalf of Interim.  Defendants opposed the motion on several grounds.  In support of their opposition, Mack and Hogan submitted declarations, made under oath, to the Court.

In her declaration, Mack admitted to sending herself a copy of the Referral Logs on April 12, 2011, but claimed that she did not do so with the intention of using it at Interim.  Mack stated that:

- She sent copies of the Referral Logs to her personal email address "in the ordinary course of business almost every month for years" and she sent the April 12, 2011, email as part of her standard working practice, not as an attempt to steal the Referral Logs before leaving Amedisys (Mack Decl. at 2);

- the "purpose of sending these e-mails was to open [the Referral Logs] on my home computer so that I could add to the logs patients who had been referred during the previous month, an action I was required to do by Amedisys" (id.); and

- the Referral Logs would not help her at Interim because she had worked with the same clinicians for years, knew them well, and knew who to contact to solicit business without using the Referral Logs. (Id. at 3.)

Hogan stated in her Declaration that she did not intentionally take the Workbook from Amedisys and she simply forgot to return it when she left. (Hogan Decl. ¶ 5.)  Hogan also stated that the Workbook would not help her at Interim because she knew the contents of the Workbook by heart.  (Id. ¶ 3.)

On May 6, 2011, the Court held a hearing on Plaintiff's Motion for a TRO. Counsel for the Individual Defendants explained to the Court that the Individual Defendants "represented in their declarations and they've affirmed here today that whatever they have was inadvertently maintained and they are willing to delete it and return it and they certainly haven't used or disclosed it, provided it to Interim Healthcare.  They don't need it, they don't want it.  It doesn't help them in their business."  (Tr. [32] at 19.)  Based on these representations, the Court denied Plaintiff's request to temporarily restrain the Individual Defendants from soliciting business from clinicians.  The Court, however, required Defendants to (1) refrain from using any Amedisys information; (2) return any Amedisys material by May 9; and (3) submit to a third party forensic examination of their computers [21].[4]

On May 18, 2011, Plaintiff moved the Court for an order preliminarily enjoining the Defendants from using Amedisys' trade-secret information and enjoining the Individual Defendants from soliciting new patients for Interim from doctors and other healthcare providers with whom they had contact while employed by Amedisys.  Plaintiff argued that Mack and Hogan made several misrepresentations in the declarations filed with the Court, that the Court should

---

[4] The Court also directed the parties to consider what discovery they needed to prepare for a preliminary injunction hearing and set the preliminary injunction hearing for May 16, 2011, which was later rescheduled, at the parties' request, for May 23, 2011.  (Tr. [32] at 27-28.)

not trust them, and that a preliminary injunction is necessary to protect Amedisys' confidential business information.

Based on information developed during discovery after the TRO hearing, Amedisys now contends that Mack made several misrepresentations in her declaration. Mack stated in her declaration that she sent copies of the Referral Logs to herself, by email, almost every month for years. (Mack Decl. at 2.) In her deposition, however, Mack could not recall any occasion where she sent herself a copy of the Referral Logs, aside from the April 12, 2011, email. (Mack Dep. at 133:14-134:2.) Mack also testified that when she signed her declaration, she did not have a basis for her statement that she sent the Referral Logs to her personal email address "almost every month for years." (Id. at 133:4-18.)

Amedisys also contends that Mack misrepresented why she sent the Referral Logs to herself. Mack stated in her declaration that she sent the Referral Logs to her personal email account on April 12, 2011, so she could work on them from home and add additional patients who had been referred during the previous month. (Mack Decl. at 2.) Mack, however, had already completed this update work and had, on April 11, 2011, sent the updated report to her supervisor. (McDonald Decl. ¶¶ 6-8.)

Amedisys further contends that Mack misrepresented the usefulness of the Referral Logs.  In her declaration, Mack stated that the Referral Logs did not help her at Amedisys because she had worked for the same ten healthcare providers for years and knew their contact information by heart.  (Mack Decl. at 1.)  Mack's new position as Vice President of Business Development at Interim involves managing a team of salespeople charged with developing referral sources throughout Georgia.  (Mack Dep. at 193:3-19.)  The Referral Logs that Mack sent to herself contain information in addition to the ten physicians with whom Mack worked while an Amedisys employee.  Amedisys contends that this additional information, which Mack does not know by memory, would aid her and her subordinates to convert Amedisys clients to become clients of Interim.

Plaintiff also introduced evidence that Hogan misrepresented the usefulness of the Workbook.  In her declaration, Hogan stated that she seldom used the Workbook while at Amedisys and that it would not help her in her duties at Interim because she knew her referral sources by heart.  (Hogan Decl. ¶¶ 3, 8.)  Hogan testified in her deposition that, while employed at Amedisys, she printed a copy of the Workbook each time she received a copy by email and used the Workbook to determine which doctors to visit.  (Hogan Dep. at 108:22-109:2.)  At her

deposition she was able to recite, by memory, the persons who served as her referral sources while at Amedisys.  (Id. at 155:12-160:3.)

On May 23, 2011, the Court held a hearing on Plaintiff's Motion for a Preliminary Injunction.  Because Plaintiff's primary basis for relief was the alleged misrepresentations made by Mack and Hogan, the hearing focused on the truthfulness of the statements made by Mack and Hogan and which were communicated to the Court by their counsel.[5]

Mack testified at the hearing that:

- despite what she claimed in her sworn declaration testimony,[6] she had not sent herself a copy of the Referral Logs almost every month for the past several years (Tr. [34] at 19, 33, 34);

- she had only done so on less than five occasions since working at Amedisys and could not specifically recall a single occasion of having done so (id.);

- she did not send herself the Referral Logs on April 12, 2011, to work on records from the previous month, as she stated in her declaration (id. at 23);

---

[5] Counsel for Mack admitted at the commencement of the hearing that misrepresentations had been made to the Court in the Mack declaration.  Counsel stated that the information in the declaration was based on information provided by Mack.  (Tr. [34] at 11.)

[6] Mack admitted at the hearing that she reviewed her declaration and had adequate time to make corrections before signing it.  (Id. at 21.)  She also admitted that she did nothing to determine how often she emailed herself the Referral Logs before signing the declaration.  (Id. at 22.)

- the Referral Logs did not contain data from the previous month that she could have worked on (id. at 36-38); and

- she sent herself Referral Logs containing information about territories where she did not work at Amedisys, but did at Interim, and she did not know this information by heart.  (Id. at 42-47).

Perhaps most troubling is the timing of the April 12, 2011, email.  Mack testified that she made the decision to join Interim the weekend of April 16 and officially accepted the job at Interim on April 18, the day she left Amedisys.  (Id. at 23, 24.)  Plaintiff, however, introduced an April 14, 2011, email exchange between Interim and Mack that directly contradicted her testimony to the Court under oath. The email, entitled "My wish list," detailed several things Mack requested for her "roll out" at Interim, including business cards and letterhead.  (Pl's Ex. 61 at 3.) Mack also stated in the exchange: "THANK YOU FOR THIS OPPORTUNITY, WOW I AM SOOOOO EXCITED . . . I HAVE A FEW OF [sic] THINGS TO [PREPARE] FOR PERSONALLY AND PROFESSIONALY."  (Id. at 4 (emphasis in original).)  The exchange also indicated that Interim had purchased for Mack a 2011 Mini Cooper.  (Id. at 1.)  Mack reluctantly admitted that she had been promised a car to come to work for Interim.  (Tr. [34] at 35, 52, 53.)  Interim also attached to the email exchange a copy of its upcoming sales and budget projections

for the remainder of 2011.[7]  Despite this overwhelming evidence showing that Mack had accepted the position at Interim as early as April 14, 2011, Mack incredibly maintained that she did not decide to work for Interim until April 16, 2011.[8]  (Id. at 53.)  Mack's testimony at the hearing was not believable.

Brenda Hogan also testified at the hearing and the Court found her testimony credible.  Hogan explained that she had worked in the industry for over twenty years and during that time she had developed substantial relationships, both professional and personal, with the clinicians who refer patients to her.  (Id. at 121-23.)  Because of these relationships, Hogan did not need the Workbook or other Amedisys materials to know who to contact to generate business.  (Id. at 123-26.)  Hogan credibly testified that she inadvertently retained a copy of the Workbook when she left Amedisys.[9]  (Id. at 133-35, 139.)

---

[7] The Court finds it inconceivable that Interim would have sent this information to Mack had she not accepted her position at Interim.  Interim's counsel deemed this information so sensitive that he requested that it be designated "attorneys' eyes only" pursuant to the parties' protective order.  (Tr. [34] at 26-27.)

[8] Hogan testified that she decided to work for Interim on April 14, 2011.  (Id. at 112.)

[9] The Court also notes that the evidence indicates that Amedisys lacked a rigorous protocol to ensure employees returned confidential material upon their departure.  (Id. at 130-32, 136.)  This may have contributed to Hogan's inadvertent retention of the Workbook.  There is no evidence that Hogan believed she was entitled to keep copies of the Workbook after she departed Amedisys' employ.

On May 25, 2011, two days after the hearing, Amedisys filed a Motion for leave to file supplemental exhibits in support of its motion for a preliminary injunction [35]. Amedisys asked the Court to consider a May 4, 2011, text message to Mack from one of her subordinates at Interim, Donnisha Barnes. The "Barnes Message," sent on the day Amedisys filed the Complaint, stated:

> Hi Jenny when we meet can u please brng ur cheat sheet lol u have frm Amedysis [sic] so that I can see other places I may target 2 increase my numbers.

Mack responded, the day after the Complaint was filed, stating:

> I donot [sic] have anything from Amedisys .we just have to go building to building to see what meds are in the area, also think about rehabs, PC homes, dialysis clinics, how about the dekalb hospitals?

Amedisys also offered an email exchanged between Interim executives dated April 8, 2011. The email referred to Mack as Interim's "new Director of Business Dev[elopement]." This email further confirms that Mack had been untruthful when she testified at the hearing that that she had not accepted a job with Interim before she sent the Referral Logs to herself. Mack's self-serving response to the Barnes Message further discredits Mack's testimony. Importantly, Mack did not deny she had informed Barnes that she had a "cheat sheet" at some time which could be used to target Interim's business solicitation. She simply stated she did not have the materials, which Amedisys, in its Complaint, accused her of taking.

## II.    DISCUSSION

To be eligible for a preliminary injunction a movant must show: (1) a substantial likelihood of prevailing on the merits; (2) that Plaintiff will suffer irreparable injury if the relief is not granted; (3) that the threatened injury outweighs the harm the relief would inflict on the opposing party; and (4) that if granted, the injunction would not be adverse to the public interest.  Fed. R. Civ. P. 65; see Schiavo ex rel. Schindler v. Schiavo, 403 F.3d 1223, 1225-26 (11th Cir. 2005); Parker v. State Bd. of Pardons and Paroles, 275 F.3d 1032, 1034-35 (11th Cir. 2001); Baker v. Buckeye Cellulose Corp., 856 F.2d 167, 169 (11th Cir. 1995). Preliminary injunctive relief is a drastic and extraordinary remedy which should not be granted unless the movant can clearly establish each of the four elements. Four Seasons Hotels and Resorts, B.V. v. Consorcio Barr, S.A., 320 F.3d 1205, 1210 (11th Cir. 2003).  "The burden of persuasion on all of the four requirements for a preliminary injunction is at all times upon the plaintiff."  Canal Auth. of Florida v. Callaway, 489 F.2d 567, 573 (5th Cir. 1974).

### A.    Likelihood of Prevailing on the Merits on Plaintiff's Claim for Misappropriation of Trade Secrets

"A claim for misappropriation of trade secrets under the Georgia Trade Secrets Act [the "GTSA"] requires a plaintiff to prove that '(1) it had a trade secret and (2) the opposing party misappropriated the trade secret.'"  Capital Asset

Research Corp. v. Finnegan, 160 F.3d 683, 685 (11th Cir. 1998) (quoting Camp Creek Hospitality Inns, Inc. v. Sheraton Franchise Corp., 139 F.3d 1396, 1410 (11th Cir. 1998)).

i.      Trade Secrets

The GTSA defines trade secrets as confidential, proprietary information not commonly known by the public that: "(A) Derives economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and (B) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy."  O.C.G.A. § 10-1-761(4).  Trade secrets can include methods, financial plans, product plans, or lists of actual or potential customers.  Id.

The parties dispute whether the Referral Logs and the Workbook constitute trade secrets.  Amedisys contends the Referral Logs reveal which doctors refer which patients to Amedisys and allow its sales representatives to identify which patients require long-term care and are susceptible to "poaching" by a competing home healthcare provider.  The Workbook, Amedisys claims, contains information about how often certain clinicians refer patients to in-home care, for what ailments they recommend in-home care, and which in-home care providers receive the

referrals.  The Defendants argue that the Referral Logs and the Workbook simply contain a collection of names of healthcare providers and facilities, and such information does not constitute a trade secret.

Plaintiff has satisfied its burden of establishing that the Referral Logs and the Workbook constitute trade secrets.  The Referral Logs and the Workbook are more than a list of names of healthcare providers and facilities.  They are not simply a directory of healthcare providers.  They contain valuable, proprietary information uniquely known to Amedisys, and which is not publicly available. This information, which Amedisys collects, evaluates, analyzes, and arranges, enables Amedisys employees to make informed, fact-based decisions on where to focus their business solicitation efforts.  It is this information that transforms an ordinary list of doctors and healthcare providers to a trade secret.  Essex Grp., Inc. v. Southwire Co., 501 S.E.2d 501, 503 (Ga. 1998) ("[T]hat some or all of the components of the trade secret are well-known does not preclude protection for a secret combination, compilation, or integration of the individual elements.") (quoting Restatement (Third) of Unfair Competition § 39(f) (1995)).

While the names of the doctors and healthcare centers could be developed in the logs by other means, including through a cumbersome and time-intensive

deconstruction of medical directories, visitation to hospitals, internet searches,[10] and the like, these "public" sources do not indicate which doctors or healthcare centers refer patients to in-home care, for what ailments the patients suffer from, who provided the referrals, and do not allow one to identify which patients are susceptible to poaching by a competing home healthcare provider.  Paramount Tax & Accounting, LLC v. H&R Block E. Enters., 683 S.E.2d 141, 147 (Ga. Ct. App. 2009) ("While many names and addresses are readily available from a phone book, the fact that certain individuals listed therein have previously used [plaintiff] for tax preparation services is not.").  This is uniquely developed by Amedisys and even Mack and Hogan admitted in their testimony that this referral information is not publicly known.  (Tr. [34] at 57-60, 99-100.)  This type of information is simply not generally available or ascertainable from other sources and is eligible for trade secret protection.  See Crews v. Roger Wahl, C.P.A., 520 S.E.2d 727, 732 n. 4 (Ga. Ct. App. 1999) ("Confidentiality is afforded only where the customer list is not generally known or ascertainable from other sources . . . .").

---

[10] Defendants contend the Referral Logs and the Workbook can be constructed using these processes.  A simple review of the Referral Logs and the Workbook to see the information they contain and how it is structured discredit that the Referral Logs and the Workbook can be developed from public source information.

The evidence also shows that Amedisys undertook reasonable efforts to maintain the confidentiality of the Referral Logs and Workbook.[11]  Amedisys only transmitted the Referral Logs and the Workbook through its protected computer network and email system.  Amedisys made geographically specific Workbooks available to only Account Executives who work in those areas.  Finally, Amedisys marked each page with a "confidential property" designation.  See Elec. Data Sys. Corp., v. Heinemann, 493 S.E.2d 132, 136 (Ga. 1997) (affirming determination of trade secret, in part, because employer's confidentiality agreements and limited access constituted reasonable care).  Both the Referral Logs and the Workbook constitute and contain protectable trade-secret information.

  ii.  Misappropriation

The Court next considers whether the Defendants misappropriated the trade secrets belonging to Amedisys.  A person misappropriates a trade secret by acquiring it improperly or disclosing it without consent.  O.C.G.A. § 10-1-761(1), (2) (defining "improper means" as including "theft, bribery, misrepresentation, breach or inducement of a breach of a confidential relationship or other duty to maintain secrecy or limit use, or espionage through electronic or other means.")

---

[11] This was in addition to protections afforded to this information by HIPAA, with which Defendants would be required to comply.  Mack understood that HIPAA prohibited her from sharing patient information with someone outside of Amedisys.  (Tr. [34] at 73.)

*Defendant Mack*

Plaintiff contends that Mack misappropriated Amedisys' trade secrets when she sent the Referral Logs to her personal email account.  Mack testified that she sent the Referral Logs to her personal email account, not to take them from Amedisys, but to work on them from home.  The Court concludes Mack's testimony is not truthful and that she misappropriated the Referral Logs.  This conclusion is based on the timing of the transmission of the Referral Logs to Mack's personal email account, that she did not need the Referral Log information to complete a task for her Amedisys supervisor because it is now clear that the task was completed before the Referral Logs were sent on April 12, 2011, and based on the blatant inconsistencies and untruthfulness of Mack's testimony in her declaration and at the TRO and Preliminary Injunction hearings.

The Barnes Message confirms Mack's untruthfulness and that she is conceding her possession and use of Amedisys' confidential information.[12]  The Barnes Message indicates that Mack told Barnes that she had a "cheat sheet" and Barnes could use it to identify clinicians likely to refer patients.  Amedisys employees use the Referral Logs for precisely this purpose.  It is inconceivable that

---

[12] The Court grants Plaintiff's Motion for Leave to File Supplemental Exhibits in Support of its Motion for Preliminary Injunction [35].  Although Amedisys submitted this information after the Preliminary Injunction hearing, the Court will not turn a blind eye to Mack's misrepresentations.

Barnes would have written this message if Mack had not described the Referral Logs to Barnes and explained their value and availability.[13]  The totality of the information available to the Court, including the Court's opportunity to observe Mack's hearing testimony, how she responded to questions, and the logic of her answers confirm to the Court that Mack did not at the hearing and is not now being truthful.  The Court concludes that Mack sent the Referral Logs to herself to use them to solicit business at Interim, not to simply work on them from home, for the benefit of her former employer.  The Court finds that Mack's response to the Barnes Message is a calculated attempt to conceal her misconduct in taking and intending to use confidential, protected information from Amedisys.  Amedisys has shown that it has a substantial likelihood of prevailing on its trade secret claim against Mack.

---

[13] The Individual Defendants offered a Declaration from Barnes to explain her text message.  Barnes stated that she wrote the message in jest, that she did not expect Mack would provide Amedisys information or documents, and that Mack did not provide her with Amedisys documents.  Given the circumstances of this case, the Court finds this explanation doubtful and is likely an attempt to limit the impact of damaging evidence.  Even if true, however, Barnes does not describe how she knew that Mack had an Amedisys "cheat sheet."  This leads the Court to conclude that Mack told Barnes that she had Amedisys material and that Mack intended to make it available to Interim employees.

### *Defendant Hogan*

Amedisys contends that Hogan misappropriated Amedisys' trade secrets when she kept her Workbook after resigning.  Hogan testified that she kept her copy of the Workbook in her carry-all bag and that she inadvertently took it with her when she left Amedisys.  (Tr. [34] at 133-35, 139.)  When Amedisys asked for the Workbook back, she promptly returned it.  (Id. at 138-40.)  Hogan further testified that she rarely used the Workbook while at Amedisys, and that she only looked at it once every quarter to see if any doctors had been added or removed from her territory.  (Id. at 124.)  She also stated that over her many years in the industry she developed close personal and professional relationships with the majority of the doctors who referred patients to her.  (Id. at 125.)  Because of these relationships, Hogan did not need the Workbook to know which physicians to contact or how to reach them.  There is no evidence that Hogan used the Workbook while working for Interim.

The Court finds Hogan's testimony credible.  The Court believes that Hogan inadvertently failed to return the Workbook after leaving Amedisys and did not, and had no intent to, use the Workbook to compete against Amedisys.  The Court concludes that Plaintiff has failed to show a substantial likelihood of prevailing on its trade secret claim against Hogan.

### *Defendant Cathey*

Plaintiff has not offered any evidence that Cathey took or received any trade secrets. Amedisys, instead, argues that because Cathey works as an assistant to Mack, Cathey inevitably will use material Mack misappropriated from Amedisys. Plaintiff's speculation about use of misappropriated material is insufficient to meet Plaintiff's burden to show a likelihood of prevailing on the merits. The requested relief, with respect to Cathey, is denied.

### *Defendant Interim*

Amedisys argues that "[b]y allowing Mack, Hogan, and Cathey to continue soliciting healthcare facilities, providers, and patients with whom they had contact or about whom they obtained information for Amedisys, Interim has misappropriated Amedisys trade secrets." (Pl's Br. [25.1] at 12.) Amedisys relies on Bennett v. United States, to argue that Interim is liable for the acts of its employees. 102 F.3d 486, 489 (11th Cir. 1996). In Bennett, the Eleventh Circuit considered whether the United States could be held liable for a soldier's accidental shooting on an army base. Id. at 488. The court looked to Georgia respondeat superior law and noted that "Georgia courts will hold an employer responsible for the conduct of its employee if the employee acted in the course of the employer's business and with a desire to benefit the employer." Id. at 489. Conversely, "when

an employee undertakes an act purely personal in nature, no respondeat superior liability may be imposed." Id.  The Eleventh Circuit noted that "[t]he question of whether a given act falls within the scope of employment is highly fact-specific, and turns on the unique circumstances of the case at bar." Id.

In this case, Plaintiff has established that Mack acted within the scope of her employment with Interim when she continued to use the misappropriated Referral Logs to solicit patients.[14]  There is some question whether Mack took the Referral Logs to benefit Interim, or whether she took them to benefit herself.  While new patient referrals would likely benefit Interim, they would most directly benefit Mack as she receives a commission for her work and the work of her subordinates.  The record here, however, shows that use by Mack of wrongly appropriated Amedisys information in her work for Interim would be wrongful use within Mack's scope of employment for Interim.  That the Referral Logs were perceived as beneficial to Interim and its business is supported by the Barnes Message.  The Court concludes that Plaintiff has met its burden of showing that it is substantially likely to succeed on the merits of its claim regarding use of Amedisys' confidential information to further Interim's business.

---

[14] There is a lack of evidence showing that Interim asked the Individual Defendants to take Amedisys trade secret materials or that it was even aware of the materials before this lawsuit.

B.     Irreparable Harm

The Court concludes that Amedisys will suffer irreparable harm if Mack is allowed to solicit patients from the same doctors and facilities that were referenced in the misappropriated Referral Logs or if Interim allows Mack to do so.[15] Amedisys invested substantial time and expense to create the Referral Logs that Mack misappropriated.  Allowing Mack to continue to solicit business from the same doctors and facilities will give Mack and Interim an unearned advantage in the marketplace and will likely cause Amedisys to lose patients and referral sources.

Because of Mack's repeated misrepresentations, the Court simply cannot trust that Mack no longer has a copy of the Referral Logs, or has not maintained a copy of the Referral Logs in some other form, or that she will not use the Referral Logs to compete unfairly with Amedisys.  Mack misrepresented (1) how often she sent herself the Referral Logs; (2) why she sent herself the Referral Logs; (3) how useful the Referral Logs would be to her at Interim; (4) when she accepted the

---

[15] Amedisys contends that Mack's misappropriation of trade secrets is *per se* irreparable harm.  (Pl's Br. [25.1] at 16, 17.)  This is an overstatement of the law and many courts refuse to issue injunctions despite finding misappropriation of trade secrets.  See O.C.G.A. § 10-1-762(a) (providing that "actual or threatened misappropriation *may* be enjoined.") (emphasis added); Salsbury Labs., Inc. v. Merieux Labs., Inc., 735 F. Supp. 1537, 1543 (M.D. Ga. 1987) (refusing to grant preliminary injunction when monetary damages were sufficient to compensate for alleged misappropriation of trade secrets).

position at Interim; and (5) whether she intended to use the Referral Logs at
Interim.  Based on these misrepresentations, the Court concludes that Mack and
Interim are required to be prevented from allowing Mack to solicit healthcare
facilities and providers of patients that are listed in the Referral Logs that Mack
transmitted to her personal email account on April 12, 2011.

C.      Balance of the Harms

The balance of the harms favors Amedisys.  If Mack continues to unfairly
compete, Plaintiff stands to lose significant revenue and the value of its trade
secrets will erode materially.  Mack, on the other hand, "cannot suffer
compensable harm when enjoined from an unlawful activity."  Specialty Chem. &
Servs., Inc. v. Chandler, No. Civ. 1:87-cv-2338MHS, 1988 WL 618583, at *4
(N.D. Ga. Sept. 29, 1988); see MediaOne of Delaware, Inc. v. E & A Beepers and
Cellulars, 43 F. Supp. 2d 1348, 1354 (S.D. Fla. 1998).  Interim also will suffer
little harm as it is merely prohibited from allowing Mack to continue to use the
information contained in the misappropriated Referral Logs.

The Individual Defendants argue that if the Court grants an injunction, Mack
"will be precluded from maintaining gainful employment in the field and industry
in which [she has] extensive experience."  (Individual Def.'s Opp'n [27] at 23.)
This is simply not true.  The Court is only enjoining Mack from soliciting

healthcare facilities and patients referenced in the Referral Logs that Mack

misappropriated from Amedisys.  Mack is permitted to solicit healthcare facilities,

providers, and patients that were not listed in the Referral Logs.  Interim argues

that Amedisys is trying to subject Mack to a non-competition agreement, where no

such agreement exists.  The proposed injunctive relief prevents only a subset of

competition.  It does not prohibit Mack from competing or engaging in other

meaningful work for Interim. It also does not prohibit Interim from competing, it

simply prohibits Interim from allowing Mack to compete unfairly.  AmBrit, Inc. v.

Kraft, Inc., 812 F.2d 1531, 1547 (11th Cir. 1987) ("We review the district court's

order [issuing an injunction] only for an abuse of discretion; '[t]he trial judge's

ability to formulate a decree tailored to deal with the violations existent in each

case is normally superior to that of any reviewing court, due to his familiarity with

[the] testimony and exhibits.'") (quoting United States v. Loew's, Inc., 371 U.S.

38, 52 (1962)).

  D. Public Interest

  An injunction prohibiting Mack from soliciting patients from doctors and

facilities that are referenced in the Referral Logs she took from Amedisys will best

serve the public interest.  There is a strong public policy in favor of promoting fair

competition.  MacGinnitie v. Hobbs Grp., LLC, 420 F.3d 1234, 1243 (11th Cir.

2005); <u>Salsbury Labs, Inc. v. Merieux Labs, Inc.</u>, 735 F. Supp. 1537, 1544 (M.D. Ga. 1987) ("public interest favoring competition 'does not mean that defendants are entitled to free access to plaintiff's trade secrets nor does this mean that defendants may compete unfairly.'").  There is also a strong public policy for protecting trade secrets from misappropriation.  <u>Wesley-Jessen, Inc. v. Armento</u>, 519 F. Supp. 1352, 1361 (N.D. Ga. 1981).  Allowing Mack to compete unfairly and use Amedisys' trade secrets would undermine those policies.

     E.     Remaining Claims Against Mack

In addition to its trade secret claim, Plaintiff alleges that Mack violated the Computer Fraud and Abuse Act ("CFAA"), the Store Communications Act ("SCA"), and breached her employment contract with Amedisys.  The Court concludes that Plaintiff has shown that it has a substantial likelihood of prevailing on the merits of each of these additional claims against Mack.

The Computer Fraud and Abuse Act ("CFAA") provides a private cause of action against a person who "accesses a computer without authorization or exceeds authorized access," to obtain "information from any protected computer."  18 U.S.C. § 1030(a)(2)(C).  The CFAA defines the term "exceeds authorization" as "to access a computer with authorization and to use such access to obtain or alter

information in the computer that the accesser is not entitled to obtain or alter." Id.

§ 1030(e)(6).

Plaintiff contends that Mack exceeded her authorized access by sending

Referral Logs to herself for reasons that had nothing to do with her work at

Amedisys.  (Pl's Br. [25.1] at 13.)  While there is some question of whether

Plaintiff generally permitted Mack to send the Referral Logs to her personal email

account, there is no question that Mack exceeded any authority she had when she

sent them to herself after accepting a position at Interim for use in competing with

Amedisys.[16]  United States v. Rodriguez, 628 F.3d 1258, 1263 (11th Cir. 2010)

(holding that an employee exceed his authorization when he accessed employer

records for non-business reasons in violation of employer policy); Int'l Airport

Centers, L.L.C., v. Citrin, 440 F.3d 418, 420 (7th Cir. 2006) (concluding that a

former employee's authorization to access his employer's computers terminated

when he decided to quit his job).

Plaintiff similarly alleges that Mack violated the Stored Communications

Act ("SCA") by sending herself the Referral Logs.  The SCA imposes civil

---

[16] Mack admitted that she had no business reason for sending some of the Referral
Logs to herself, even while employed at Amedisys.  (Tr. [34] at 42:11-43:9.)  The
Court further notes that the Referral Logs contained information protected by
HIPPA and Amedisys prohibited its employees from accessing or using protected
health information except as required by their job duties.  (Pl's Motion for TRO,
Ex. A [2.2] at 3.)

liability on those who "intentionally access without authorization a facility through which an electronic communication service is provided; or intentionally exceeds an authorization to access that facility; and thereby obtains . . . a wire or electronic communication while it is in electronic storage . . . ."  18 U.S.C. §§ 2701(a), 2707. Mack likely violated the SCA by downloading, copying, or transferring to her personal email account trade-secret material after she accepted employment at Interim.  Lasco Foods, Inc. v. Hall & Shaw Sales, Marketing, & Consulting, LLC, No. 4:08CV01683 JCH, 2009 WL 3523986, at *5 (E.D. Mo. Oct. 26, 2009) (finding that employees exceed authorization under the SCA when they began accessing their employers materials to benefit their own interests, not their employer's); see also Genworth Fin. Wealth Mgmt., Inc. v. McMullan, 721 F. Supp. 2d 122, (D. Conn. 2010).

The Court also agrees that Mack likely breached her employment contract with Amedisys.  Mack's employment contract required her to return any confidential information to Amedisys upon leaving the company.  Mack clearly retained a copy of the Referral Logs after leaving Amedisys and Plaintiff has

shown that it is likely to succeed on the merits of its breach of contract claim against Mack.[17]

## III.   CONCLUSION

For the foregoing reasons,

**IT IS HEREBY ORDERED** that Plaintiff's Motion for Preliminary Injunction [25] is **GRANTED IN PART** and **DENIED IN PART**.  Defendant Mack and Interim are **ENJOINED** from allowing Mack to contact on behalf of Interim, either directly or indirectly, any healthcare facilities, providers, patients, or prospective patients referenced in the Referral Logs she emailed to her personal email account on April 12, 2011, or any other Referral Logs or Referral Log information to which she now has access ("the Reference Log Persons").  Indirect

---

[17] Plaintiff also contends that Hogan breached her employment contract with Plaintiff and that Hogan's alleged breach warrants a preliminary injunction. Amedisys contends that, because Hogan did not return the Workbook when she left Amedisys, she breached the contract.  The Court finds that Plaintiff Hogan did not return the Workbook at the end of her employment, as her contract required her to do, and Plaintiff is likely to succeed on its contract claim against Hogan.  The Court notes, however, that a preliminary injunction against Hogan is not warranted based on her alleged breach of contract.  Hogan returned her copy of the Workbook shortly after she left Amedisys.  Any damages that resulted from this breach can be addressed through monetary, not injunctive, relief.  Corbin v. Corbin, 429 F. Supp. 276, 282 (N.D. Ga. 1977) ("[A] mere threatened monetary injury, which can be addressed in damages, is insufficient to establish the irreparable injury essential to the issuance of a preliminary injunction.").

contact shall include, but is not limited to, assisting others at Interim to identify, plan for, or make contact with any Reference Log Person.

**IT IS HEREBY FURTHER ORDERED** that Plaintiff's request for a preliminary injunction prohibiting Defendants Hogan and Cathey from soliciting business on behalf of Interim is **DENIED**.

**IT IS HEREBY FURTHER ORDERED** that the Defendants are enjoined from using any information obtained from or owned by Amedisys and which cannot be independently obtained by Defendants from other sources.

**IT IS HEREBY FURTHER ORDERED** that Plaintiff's Motion for Leave to File Supplemental Exhibits in Support of its Motion for Preliminary Injunction [35] is **GRANTED**.

**IT IS HEREBY FURTHER ORDERED** that the parties are directed to meet to develop a Detailed Discovery Plan (the "Plan") and to submit the Plan to the Court on or before 5:00 p.m. on June 10, 2011.[18]

---

[18] The Parties are advised to go to the district court's website at www.gand.uscourts.gov. On the home page, locate the Attorney Information link which will direct you to Preparation for a Civil and/or Criminal Trial Before Judge Duffey. Here, the Court has provided its Standing Order Regarding Civil Litigants, which describes the contents of the Plan. (http://www.gand.uscourts.gov/pdf/Standing_Order_Re_Civil_Litigation.pdf ).

**SO ORDERED** this 3rd day of June, 2011.


 

_____
WILLIAM S. DUFFEY, JR.
UNITED STATES DISTRICT JUDGE